Mazin A. Sbaiti, Esq. (CA Bar No. 275089)
Email: mas@sbaitilaw.com
**SBAITI & COMPANY PLLC**
Dallas Arts Tower
3102 Maple Avenue, Suite 400
Dallas, TX 75201
Tel: 214-214-3400

Christopher L. Ayers, Esq. (*pro hac vice* forthcoming)
Email: Chris.Ayers@sbaitilaw.com
**SBAITI & COMPANY NJ LLC**
100 Mulberry St.
3 Gateway Center, Suite 1102
Newark, NJ 07102
Telephone: (973) 954-2000

*Attorneys for Plaintiff and Proposed Class*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| TAHER SHAKIR, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>GKN AEROSPACE TRANSPARENCY SYSTEMS INC., a California Corporation; GKN AEROSPACE SERVICES LTD., a United Kingdom Private Limited Company; and MELROSE INDUSTRIES PLC, a United Kingdom Public Company,<br><br>Defendants. | Case No.  8:26-cv-01341<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**<br><br>1) **NEGLIGENCE**<br>2) **TRESPASS**<br>3) **PRIVATE NUISANCE**<br>4) **PUBLIC NUISANCE**<br>5) **STRICT LIABILITY FOR ULTRA-HAZARDOUS ACTIVITY**<br>6) **TRESPASS TO CHATTELS/CONVERSION** |

1

Plaintiff TAHER SHAKIR ("Plaintiff") brings this class action individually and on behalf of all similarly situated individuals who reside in, work in, or own property near Defendants' GKN Aerospace manufacturing facility located at 12122 Western Avenue in Garden Grove, California (the "Facility"). Plaintiff alleges the following based on personal knowledge as to their own circumstances and on information and belief as to all other matters, including investigation conducted by their attorneys.

## SUMMARY OF THE CASE

1.    This action seeks redress for the injuries and damages arising from a preventable hazardous chemical emergency (the "Crisis") in which a compromised industrial storage tank containing thousands of gallons of methyl methacrylate ("MMA"), an extremely volatile and flammable chemical used in the manufacturing of acrylic plastics, overheated, off-gassed toxic vapor, and placed tens of thousands of nearby residents in imminent danger of a catastrophic explosion.

2.    The Crisis is attributable in all respects to Defendants' failure to properly store, contain, handle, monitor, and maintain the hazardous chemicals at their Facility. As a direct consequence of Defendants' failures, over 50,000 residents across six Orange County cities were ordered to evacuate a nine-square-mile area surrounding the Facility due to the imminent threat of toxic chemical exposure and catastrophic explosion. Plaintiff and the proposed Class have suffered, and continue to suffer, loss of enjoyment of property, property damage, exposure to toxic material, inconvenience, disruption, emotional distress, and significant economic damages as alleged more specifically below.

3.    The severity of the Crisis prompted California Governor Gavin Newsom to declare a state of emergency in Orange County on May 23, 2026, and to request a Federal Emergency Declaration from President Donald Trump, upon determining that the conditions posed a "magnitude and impact . . . likely to be beyond the control of the services, personnel, equipment, and facilities of any single local government and require the combined forces of a mutual aid region or regions to appropriately respond."

2

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

4. Accordingly, Plaintiff brings claims against Defendants individually and on behalf of all similarly situated individuals for: (1) Negligence; (2) Trespass; (3) Private Nuisance; (4) Public Nuisance; (5) Strict Liability for Ultrahazardous Activity; and (6) Trespass to Chattels/Conversion.

**PARTIES**

5. Plaintiff TAHER SHAKIR is an individual who resides in Anaheim, California and is a citizen of the State of California.

6. As a direct result of Defendants' negligent, reckless, and/or intentional conduct giving rise to the Crisis, Plaintiff was subjected to mandatory evacuation orders and has suffered substantial damages, including, but not limited to, loss of use and enjoyment of property, evacuation-related expenses, disruption of daily life, significant inconvenience, and contamination of the property by toxic chemicals and their harmful byproducts released by Defendants.

7. Defendant GKN Aerospace Transparency Systems Inc. is a California Corporation with its principal place of business at 12122 Western Avenue, Garden Grove, California 92841. Defendant GKN Aerospace Transparency Systems Inc. describes that it "serve[s] over 90% of the world's aircraft and engineer manufacturers" and states that it hopes "to be the most trusted and sustainable partner in the sky."

8. Defendant GKN Aerospace Services Ltd. is a United Kingdom Private Limited Company, with its principal place of business at 1301 Solana Boulevard, Suite 1528, Westlake, Texas 76262.

9. Defendant Melrose Industries PLC is a United Kingdom Public Company, with its principal place of business at 1301 Solana Boulevard, Suite 1528, Westlake, Texas 76262. Melrose Industries PLC describes itself as "an industry-leading global aerospace technology business" operating 32 manufacturing sites across 12 countries with approximately 16,000 employees worldwide. Melrose reported 2024 revenue of

approximately $4.48 billion, with adjusted operating profit of £540 million, representing a 42% increase over 2023.

10. Defendant GKN Aerospace Transparency Systems Inc. is a wholly owned United States subsidiary and operating business within the broader GKN Aerospace group, which is headquartered in the United Kingdom and operates globally through Defendant GKN Aerospace Services Ltd.

11. Defendant GKN Aerospace Services Ltd. is wholly owned by Defendant Melrose Industries PLC, a UK-based aerospace and engineering group.

12. At all times relevant hereto, Defendants collectively exercised and enforced centralized oversight, management, direction, and control over hazardous materials policies, operational safety protocols, environmental compliance procedures, risk management practices, industrial safety systems, and corporate governance affecting the day-to-day operations of Defendant GKN Aerospace Transparency Systems Inc. This centralized control expressly encompassed the handling, storage, containment, monitoring, maintenance, and management of MMA and other hazardous chemicals located at the Facility.

13. Plaintiff is informed and believes, and thereon alleges, that such policies, procedures, operational standards, and safety practices were implemented, coordinated, directed, approved, monitored, and enforced on a centralized and enterprise-wide basis by Defendants.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 and 28 U.S.C. § 1332(d)(2), because there are more than 100 putative class members, the aggregate amount in controversy exceeds $5,000,000 exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

15.    This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in the State of California and this lawsuit arises out of Defendants' acts alleged herein which originated in this District. Additionally, Defendant GKN Aerospace Transparency Systems Inc. is a California registered corporation with its principal place of business in this District.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because: (a) putative class members are residents and citizens of this District; (b) Defendants are subject to the Court's personal jurisdiction with respect to this action; (c) a substantial part of the events or omissions giving rise to the harm of the putative class members occurred in this District; and (d) a substantial part of the property that is the subject of this action is situated in this District. Finally, to the extent any Defendants are not considered residents of this District, they may be sued in any judicial district, including this District, under 28 U.S.C. § 1391(c)(3).

## FACTUAL ALLEGATIONS

### I.    Background on the GKN Aerospace Site

17.    GKN Aerospace claims to be a leading global tier one supplier of airframe and engine structures, landing gear, electrical interconnection systems, transparencies, and aftermarket services. It claims to supply products and services to a wide range of commercial and military aircraft and engine prime contractors, and other tier one suppliers.

18.    At all relevant time periods, Defendants owned, operated, controlled, and/or maintained the Facility located at 12122 Western Avenue in Garden Grove, California, and claims that they are "the world's leading provider of military transparency systems and commercial aircraft transparencies."

19.    GKN Aerospace Transparency Systems Inc. operates a 15.5-acre manufacturing facility at 12122 Western Avenue in Garden Grove, California, where the company produces military and commercial aircraft transparencies—canopies, cockpit windows, and passenger windows. The company states on its own website that it

5

"manufactures the world-leading F-35 canopy from its Garden Grove facility, as well as transparencies for the Boeing 787 Dreamliner and 737, the Airbus A350, HondaJet and Bombardier C-Series."

20.    The Garden Grove facility has operated since 1993 and employed at least 540 people as of a 2024 news release. In 2024, the company announced a $150 million customer investment to double F-35 canopy production capacity at the site, with the expansion expected to be completed in 2027.

21.    On its homepage, GKN Aerospace states: "Our approach to sustainability can be summed up in one phrase: doing the right thing—by our people, our planet, and our technology."[1]

22.    Defendant GKN Aerospace Transparency Systems Inc. uses MMA primarily to manufacture aerospace-grade acrylic plastics and transparent aircraft components such as aircraft windows, cockpit windshields, military jet canopies, passenger cabin windows, and other "transparency systems" for aerospace applications. MMA is the key chemical building block used to make polymethyl methacrylate (PMMA), commonly known as acrylic or plexiglass. In aerospace, PMMA is valued because it is lightweight, optically clear, impact resistant, and easier to shape than glass.

## II.    The Hazardous Nature of Methyl Methacrylate

23.    MMA is a highly flammable, clear organic liquid with an acrid, fruity odor. It is a hazardous, volatile, highly flammable industrial chemical that presents substantial risks to human health, property, animals, and the environment when improperly stored, released, or aerosolized.

24.    MMA readily vaporizes at room temperature, producing highly concentrated airborne vapors that are heavier than air and capable of settling, pooling, and migrating

[1] GKN Aerospace, *Sustainability*, https://www.gknaerospace.com/sustainability/.

6

into low-lying areas, structures, residences, and surrounding communities, accumulating and traveling well beyond the area of release, creating widespread and foreseeable dangers.

25.    According to the United States Environmental Protection Agency ("EPA"), MMA is known to induce a number of acute health effects in humans, including irritation to the skin, eyes, and mucous membranes, harm to the respiratory system such as chest tightness, dyspnea, coughing, wheezing, and reduced peak flow, and neurological symptoms, including headaches, lethargy, lightheadedness, and sensation of heaviness in arms and legs.

26.    The EPA has also found that exposure to MMA may result in respiratory and nasal symptoms, reduced lung function, and cardiovascular disorders. Additionally, a causal relationship has been found between occupational exposure and increased incidences of colon and rectal cancers.

27.    Exposure to MMA vapors poses serious health hazards to humans. Inhalation exposure attacks mucous membranes and commonly causes burning eyes, throat irritation, coughing, chest tightness, respiratory distress, and shortness of breath. Prolonged or concentrated inhalation exposure can result in pulmonary edema, a life-threatening accumulation of fluid within the lungs that severely impairs breathing and oxygen exchange.

28.    Direct contact with MMA may also cause significant dermatological injuries. MMA strips the skin of natural oils and can cause severe irritation, chemical burns, and contact dermatitis. Repeated exposure may lead to sensitization, meaning that once an individual becomes sensitized to MMA, even minimal future exposure may trigger severe itching, rashes, inflammation, and other allergic reactions.

29.    MMA additionally poses substantial neurological dangers because it affects the central nervous system. Overexposure to MMA has been associated with dizziness, nausea, headaches, confusion, cognitive impairment, toxic dementia, numbness, weakness

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

in the extremities, and generalized peripheral neuropathy. Chronic or repeated exposure may therefore result in long-term neurological impairment and diminished quality of life.

30.    MMA is also highly lipid-soluble, meaning it readily penetrates human skin and can pass through surgical gloves and standard protective clothing, exposing individuals to harm without their knowledge.

31.    In animals, MMA has been found to result in acute and chronic health effects such as degenerative olfactory changes in the nasal passages and lung damage, pulmonary edema, and liver damage, as well as necrotic changes in the liver, kidney, brain, spleen, and bone marrow, developmental and reproductive toxicity including reduced fetal weight, skeletal and vertebral abnormalities, developmental defects, and increased fetal deaths.

32.    MMA is also extremely flammable and chemically reactive. In the event of a fire, ignition, or explosion, MMA creates severe physical hazards and may generate a complex mixture of toxic and volatile airborne contaminants. MMA undergoes exothermic polymerization—meaning its own chemical reaction generates heat, which accelerates further reaction—creating the risk of thermal runaway and a Boiling Liquid Expanding Vapor Explosion ("BLEVE").

33.    Because of these dangerous characteristics, MMA requires strict storage, containment, monitoring, handling, ventilation, emergency response planning, and safety controls to prevent releases capable of endangering nearby residents, workers, animals, and surrounding communities.

**III.    Defendants' History of Regulatory Violations**

34.    Despite its public assurances of safety, the Garden Grove facility has a well-documented history of regulatory violations that reveals a troubling pattern of inadequate maintenance, insufficient oversight, and disregard for community safety—a pattern that foreshadowed the very Crisis at issue in this Complaint.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

35.     As early as 2018, the California Department of Industrial Relations penalized GKN [2]Aerospace after an inspection revealed the company did not maintain or inspect all active machinery on the site and improperly cooled and covered tanks. That same year, ten violations were found during Occupational Safety and Health Administration ("OSHA") visits to the facility.

36.     In 2019, the California Department of Industrial Relations filed a request in Orange County Superior Court that a judge order the company to pay $2,898 in unpaid civil penalties for the previous failures.

37.     GKN Aerospace's regulatory history extends beyond OSHA violations. The South Coast Air Quality Management District alleged that the Garden Grove site was the source of emissions of volatile organic compounds ("VOCs"), resulting in a settlement in which GKN agreed to pay $909,935 to South Coast AQMD by January 6, 2025. Notably, methyl methacrylate—the substance at the center of the current Crisis—is itself a VOC.

38.     Despite this extensive record of non-compliance, a GKN spokesperson stated in response to press inquiries regarding safety at the Facility: "Safety at our facilities is paramount. We follow all standard safety protocols and processes and are regularly audited by numerous state and federal agencies."[3] The Crisis at issue herein demonstrates the hollowness of these assurances.

---

[2] Eric Leonard, *GKN Aerospace settled air quality safety violation, agreed to pay $900K fine in 2025*, NBC LOS ANGELES (May 24, 2026), https://www.nbclosangeles.com/news/local/gkn-aerospace-air-quality-safety-violation-settlement/3894740/.

[3] Hanna Fry and Rong-Gong Lin II, *What we know about GKN Aerospace, the firm at center of O.C. chemical leak*, LA TIMES (May 23, 2026), https://www.latimes.com/california/story/2026-05-23/garden-grove-chemical-leak-what-we-know-about-gkn-aerospace.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

## IV.    The May 2026 Chemical Crisis

39.    At approximately 3:30 p.m. PDT on Thursday, May 21, 2026, the Orange County Fire Authority ("OCFA") received an alert regarding a hazardous materials emergency at the GKN Aerospace Facility. Upon arrival, first responders discovered that a 34,000-gallon industrial storage tank containing approximately 7,000 gallons of MMA had begun to overheat uncontrollably and off-gas toxic vapor into the surrounding environment. The tank was becoming dangerously pressurized and visibly bulging, exhibiting unmistakable signs that it could rupture or catastrophically explode at any moment.

40.    Division Chief Nick Freeman of the Orange County Fire Authority stated that "[MMA] is a respiratory irritant, so it can start off very mild, but it can progress to a point where, yes, you would probably require hospitalization, if not more."[4]

41.    Based upon information and belief, firefighters responding to the Facility attempted to cool the tank by directing water onto its exterior, with the goal of allowing GKN Aerospace's own response team to approach the tank and inject a neutralizing agent to reduce the chemical's volatility. However, when the response team attempted to access the tank's interior, Orange County Fire Authority Division Chief Craig Covey reported that the tank's valves were "gummed up" and completely inoperable, rendering the interior of the tank inaccessible. As a result, firefighters were unable to chemically neutralize or drain the tank's contents. The inoperable condition of the tank's valves is itself evidence of Defendants' failure to properly maintain and inspect critical safety infrastructure at the Facility.

---

[4] Jocelyn Fiset and Lauren Lyster, *Garden Grove tank hazmat: What to know about chemical leak health risks*, KTLA 5 (May 22, 2026), https://ktla.com/news/orange-county/garden-grove-tank-hazmat-chemical-health-risks/.

10

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

42.    Despite efforts to stabilize the situation, the internal temperature of the tank rose from 77 degrees on Friday to 90 degrees by Saturday, increasing at a rate of approximately one degree per hour. The temperature continued to rise beyond 90 degrees, reaching over 100 degrees by Saturday night.

43.    At that point, Chief Covey stated that "[t]here are literally two options left remaining. One, the tank fails and spills a total of about 6,000 to 7,000 gallons of very bad chemicals into the parking lot in that area, or two, the tank goes into a thermal runaway and blows up, affecting the tanks that are around them that have fuel or the chemicals in them as well." [5] Division Chief Covey further stated, "This is not precautionary . . . this thing is gonna fail, and we don't know when," and warned that the storage tank could potentially rupture or explode, resulting in widespread fire. Covey described the situation as the worst he had seen in his 32 years of fire service.

44.    As the emergency unfolded, hazardous chemical vapors and noxious odors spread beyond the boundaries of the GKN Facility and into neighboring residential communities. Because MMA vapors are heavier than air, the toxic plume posed a heightened risk of migrating into streets, homes, low-lying areas, structures, and occupied residential properties. Residents in surrounding areas reported strong chemical odors, burning sensations, respiratory irritation, headaches, dizziness, and fear regarding potential toxic exposure and contamination.

45.    Upon information and belief, MMA vapors, particulates, residues, contaminants, and/or airborne chemical byproducts physically migrated onto and into Plaintiff's and Class members' real and personal property, including structures, HVAC systems, outdoor surfaces, vegetation, soil, and personal belongings.

---

[5] Bianca Buono and Niku Kazuri, *'It fails' or 'it blows up': 2 options left for toxic chemical leak in Garden Grove, officials say,* ABC 7 (May 22, 2026), https://abc7.com/post/tank-spews-toxic-chemicals-garden-grove-prompting-evacuation-orders/19150431.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

## V.    Mass Evacuation and State of Emergency

46.    As a result, on May 21, 2026, authorities immediately issued mandatory evacuation orders affecting over 50,000 people in a nine-square-mile area spanning parts of Garden Grove, Anaheim, Cypress, Stanton, Buena Park, and Westminster. The evacuation orders were expanded on May 22, 2026 as authorities realized the increasing hazardous nature of the Crisis.

47.    In response to the escalating danger, multiple emergency response agencies, including the Orange County Fire Authority, hazardous materials response teams, law enforcement agencies, and emergency management personnel, responded to the scene and implemented large-scale emergency measures designed to protect nearby residents and the public.

48.    Emergency officials issued evacuation orders and shelter-in-place directives affecting broad portions of Garden Grove and neighboring communities. Authorities closed roads, restricted access to residential neighborhoods, established emergency perimeters, and warned residents of the continuing risk of toxic exposure, fire, explosion, and environmental contamination.

49.    On May 23, 2026, Governor Gavin Newsom declared a state of emergency in Orange County and requested a Federal Emergency Declaration from President Donald Trump.

50.    By May 24, 2026, 785 state and local first responders had been deployed. Evacuees flooded nine shelters, nearly all of which filled to capacity, with families sleeping on cots and receiving meals from World Central Kitchen and local volunteers.

51.    The Orange County District Attorney's office launched an investigation on May 22, with investigators surveying the site via drones and opening an anonymous tip line. DA Todd Spitzer ordered GKN Aerospace to preserve its records and explicitly

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

requested that employees come forward as whistleblowers, stating: "This company failed, and so I'm angry." [6]

52.    By May 25, 2026, a crack was discovered in the tank, which relieved internal pressure and eliminated the threat of a catastrophic BLEVE. However, as of May 26, 2026, mandatory evacuation orders remain in place for roughly 16,000 residents, and authorities warn there is still a possibility of a smaller explosion or leak.

53.    GKN Aerospace released a statement acknowledging: "We are acutely aware of the uncertainty this incident is causing and sincerely apologise for the ongoing disruption to the local community." [7]

## VI.    Significant Impact of the Crisis on the Community

54.    The Crisis represents one of the largest man-made disasters the Garden Grove community has ever experienced. The mandatory evacuation orders forced tens of thousands of people living and working within the evacuation zone, spanning more than nine square miles across six cities, to abruptly abandon their homes, workplaces, and daily lives.

55.    The mass evacuation created severe gridlock throughout the affected area. Residents who received reverse 911 telephone calls or police officers knocking on their doors were confronted with the alarming reality that a chemical disaster was unfolding in their neighborhood. They were advised to gather only essential belongings and flee to safety immediately, with no certainty as to when, or whether, they would be able to return.

---

[6] Dean Fioresi, *Orange County DA launches probe into toxic chemical leak in California*: *'We are not getting satisfactory answers'*, CBS NEWS (May 23, 2026), https://www.cbsnews.com/losangeles/news/garden-grove-gkn-aerospace-chemical-leak-investigation-orange-county-district-attorney-whistleblowers/.

[7] Rebecca Schneid, *Tens of Thousands Ordered to Evacuate over Chemical Tank Explosion Risk in California*, TIME (May 24, 2026), https://time.com/article/2026/05/24/garden-grove-chemical-tank-explosion-/.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

56.     Significant concerns about pollution and contamination resulting from the Crisis continue to worry residents and business owners. MMA is a strong organic solvent that easily dissolves, softens, or degrades many common plastics and rubbers. It can permanently cloud or craze acrylic glass surfaces and is highly reactive with and corrosive to carbon steel, cast iron, and ductile iron. Many items exposed to MMA will need to be properly cleaned or replaced.

57.     MMA is highly toxic and destructive to plants. Many property owners, occupants, and tenants have outdoor plants and gardens vulnerable to MMA. The land and properties need to be properly cleaned to prevent the further contamination of land, waterways, and the general environment.

58.     As of the date of the filing of this Complaint, Defendants have made no meaningful effort to reimburse the tens of thousands of displaced residents or affected business owners for the substantial expenses they have incurred as a result of the Crisis— including temporary housing, food, transportation, pet care, and lost income—much less to compensate the businesses that have suffered significant financial losses due to the evacuation orders. Defendants' failure to take responsibility for the harm they have caused further compounds the injuries suffered by Plaintiff and the Class.

## CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action individually and on behalf of all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4). The class definition(s) may depend on the information obtained through discovery. Notwithstanding, at this time, Plaintiff brings this action and seeks certification of the following proposed class (the "Class"):

60.     **Evacuee Class**: All persons who owned, rented, occupied, or resided in real property or other accommodations within the containment area, as defined by the evacuation area determined by the Orange County Fire Authority on May 22, 2026, who

sustained unreimbursed economic loss, loss of enjoyment/use of their property, property damage, and/or evacuation-related damages, excluding personal injury damages.

61.    Excluded from the Class are the following individuals: (1) officers and directors of Defendants and their parents, subsidiaries, affiliates, and any entity in which Defendants have a controlling interest; (2) all judges assigned to hear any aspect of this litigation, as well as their immediate family members; (3) any insurers or insurance syndicates whose claims for damages regarding the Crisis arise out of a right of subrogation; (4) any individual who has filed a claim of physical manifestation of personal or bodily injury; and (5) counsel representing the class and all persons employed by said counsel.

62.    Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

63.    **Numerosity and Ascertainability.** Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous that their individual joinder is impracticable. According to public information available, over 50,000 individuals were subject to the relevant evacuation orders. While the exact number of Class Members is unknown to Plaintiff at this time, Plaintiff believes that the Class includes tens of thousands of members. Class members are ascertainable by comparing the evacuation order with evacuee records and may be notified of the pendency of this action by mail and/or electronic mail, which can be supplemented if deemed necessary by the Court with published notice. The disposition of the claims of Class Members in a single action will provide substantial benefits to all parties and to the Court.

64.    **Typicality.** Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of the members of the Class because, among other things, Plaintiff sustained similar injuries to those of the members of the Class as a result of Defendants' uniform wrongful conduct, and Plaintiff's legal claims all arise from the same events and wrongful conduct by Defendants.

15

65.    **Commonality.** Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class which predominate over any questions solely affecting individual Class Members. These common questions of law and fact include, without limitation:

   a.  Whether Defendants' acts or omissions as set forth herein caused or contributed to the Crisis and resulting evacuation orders;

   b.  Whether Defendants breached their duty of reasonable care with respect to the storage of MMA;

   c.  Whether Defendants are strictly liable for injuries and damages suffered by Plaintiff and the Class because Defendants engaged in abnormally dangerous or ultra-hazardous activity;

   d.  Whether Defendants violated California nuisance laws by emitting air contaminants and/or endangering the health, safety, or welfare of the public, causing unreasonable injury or damage to property;

   e.  Whether Defendants created a private nuisance through their acts and omissions, including by creating crisis conditions indicating the release of toxic contaminants;

   f.  Whether Defendants created a public nuisance through their acts and omissions, including by creating crisis conditions indicating the release of toxic contaminants;

   g.  Whether Defendants committed trespass on the property of Plaintiff and the Class by their acts and omissions, including by causing hazardous materials to enter and contaminate said property;

   h.  Whether Defendants committed trespass to the chattels of Plaintiff and the Class through their acts and omissions, including by impairing property as to its condition, quality, or value;

16

i. Whether Defendants' acts and omissions in the course of the Crisis caused or contributed to the losses and damages sustained by Plaintiff and the Class;

j. Whether Defendants' conduct constitutes gross negligence or willful and wanton conduct;

k. Whether Plaintiff and the Class are entitled to compensatory, punitive, and/or exemplary damages.

66. **Adequacy of Representation.** Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class.

67. **Superiority of Class Action.** Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable, and questions of law and fact common to the Class predominate over any questions affecting only individual members. Furthermore:

68. Absent a class action, members of the Class as a practical matter will be unable to obtain adequate redress.

69. It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

70. When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class;

71. A class action will permit an orderly and expeditious administration of each Class Member's claims and foster economies of time, effort, and expense;

72. A class action regarding the issues in this case presents far fewer management difficulties, far better conserves judicial resources, and far more effectively protects the rights of each Class Member than would piecemeal litigation;

17

73.     Damages for any individual class member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendants' violations of law inflicting substantial damages in the aggregate would go un-remedied.

## CAUSES OF ACTION

## COUNT I – NEGLIGENCE

### (On Behalf of Plaintiffs and the Class)

74.     Plaintiff restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraph of this Complaint as though fully set forth herein.

75.     Plaintiff brings this claim individually and on behalf of the proposed Class.

76.     Defendants owed Plaintiff and members of the proposed Class a duty to exercise reasonable care in the ownership, operations, maintenance, storage, containment, monitoring, supervision, inspection, handling, and control of MMA and other hazardous chemicals maintained at the Facility.

77.     Defendants further owed a duty to design, implement, maintain, and enforce adequate safety procedures, emergency response protocols, inspection systems, containment, measures, warning systems, ventilation systems, cooling systems, and operational safeguards sufficient to prevent the release, overheating, ignition, migration, or uncontrolled discharge of hazardous chemical substances into neighboring communities.

78.     Defendants knew or reasonably should have known that MMA is an extremely volatile, flammable, reactive, and toxic chemical substance capable of causing catastrophic harm if improperly stored, maintained, monitored, or contained.

79.     Defendants further knew or reasonably should have known that any release, overheating event, containment failure, or uncontrolled chemical reaction involving MMA could foreseeably result in airborne toxic vapor migration, fire, explosion, environmental contamination, mandatory evacuations, respiratory exposure, and widespread harm to nearby residents and properties. Despite such knowledge, Defendants failed to exercise

reasonable care in the management and control of the hazardous substances maintained at the Facility.

80.     Defendants breached their duties of care by, among other things: negligently storing MMA in dangerous conditions; failing to properly inspect and maintain storage systems and equipment; failing to implement adequate temperature monitoring, pressure monitoring, cooling, containment, and emergency mitigation systems; failing to properly supervise hazardous chemical operations; failing to adequately train personnel responsible for the handling and maintenance of MMA; failing to implement proper emergency procedures; failing to timely warn surrounding residents and governmental agencies of dangerous conditions; and otherwise failing to prevent the hazardous conditions and chemical emergency described herein.

81.     Defendants further breached their duties by maintaining substantial quantities of hazardous industrial chemicals in close proximity to densely populated residential communities without adequate safeguards sufficient to protect neighboring residents and properties from foreseeable chemical releases, toxic vapor migration, evacuation conditions, and catastrophic industrial failures. Defendants prioritized operational convenience, production concerns, cost savings, and profit over the implementation of adequate industrial safety measures necessary to protect the public.

82.     Defendants' well-documented history of regulatory violations, including the 2018 citation for failing to maintain machinery and improperly cooling tanks, ten OSHA violations in the same year, and the nearly $1 million AQMD settlement for VOC emissions, establishes a clear and persistent pattern of inadequate maintenance and disregard for safety obligations. That the Facility's tank lacked a functional drain valve at the time of the Crisis, and that Defendants failed to maintain safe operating temperatures within the tank, constitutes compelling evidence of Defendants' breach of their duty of care to Plaintiff and the surrounding community.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

83.    As a direct and proximate result of Defendants' negligent acts and omissions, crisis circumstances were created, including the release of MMA and hazardous chemical vapors and their byproducts into the surrounding environment, creating dangerous emergency conditions that caused governmental evacuation orders, shelter-in-place directives, road closures, public safety warnings, and substantial interference with the use and enjoyment of nearby homes and properties.

84.    Plaintiff and members of the proposed Class were forced to evacuate, refrain from occupying their residences, alter their daily activities, incur displacement-related expenses, and endure fear, inconvenience, annoyance, contamination concerns, and other damages arising from the hazardous conditions created by Defendants.

85.    The injuries and damages suffered by Plaintiff and the proposed Class were foreseeable consequences of Defendants' negligent conduct. Defendants knew or reasonably should have known that the negligent storage, handling, maintenance, containment, and supervision of MMA created an unreasonable risk of catastrophic chemical failure and substantial harm to neighboring communities. Nevertheless, Defendants failed to take reasonable precautions necessary to prevent the MMA emergency and resulting injuries and damages suffered by Plaintiff and the proposed Class.

86.    In addition to the foregoing, and in the alternative, the injuries and damages suffered by Plaintiff and the Class were caused by acts or omissions of Defendants that may be beyond the ability of Plaintiff to prove with specificity at this stage, but which were exclusively within the knowledge and control of Defendants. Under the circumstances, there is no reasonable conclusion other than that the Crisis resulted from Defendants' negligence in maintaining, monitoring, and controlling the MMA storage systems at the Facility. A properly maintained and monitored chemical storage tank does not overheat, off-gas toxic vapors, and threaten catastrophic explosion. The Crisis would not have occurred had Defendants exercised the high degree of care imposed upon them by law. Plaintiff therefore pleads the doctrine of res ipsa loquitur.

87.     Plaintiff did not consent to Defendants' conduct, which required the public to evacuate for multiple days to avoid immediate harm and has created long-lasting and continuing harm.

## COUNT II – TRESPASS

### (On Behalf of Plaintiffs and the Class)

88.     Plaintiff restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraph of this Complaint as though fully set forth herein.

89.     Plaintiff brings this claim individually and on behalf of the proposed Class.

90.     Plaintiff and the Class are owners, occupants, or tenants of real property.

91.     Defendants caused the Crisis occurring near the real properties of Plaintiff and the Class, which in turn caused MMA and hazardous chemical vapors and their byproducts to travel to the properties of Plaintiff and the Class.

92.     Plaintiff and the Class did not give Defendants permission to cause MMA and hazardous chemical vapors and their byproducts to enter their properties.

93.     As a result of Defendants' conduct, Plaintiff and the Class have suffered damages.

94.     Defendants acted with a conscious disregard of the rights of others and put their own financial interests ahead of the interests of Plaintiff and the Class, which constitutes malice.

95.     Defendants engaged in conduct that subjected Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

96.     Thus, Defendants acted with oppression and/or malice and Plaintiff and the Class are, therefore, entitled to punitive damages in an amount according to proof at trial.

21

## COUNT III – PRIVATE NUISANCE

### (On Behalf of Plaintiffs and the Class)

97.    Plaintiff restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraph of this Complaint as though fully set forth herein.

98.    Plaintiff brings this claim individually and on behalf of the proposed Class.

99.    Plaintiff and the Class are owners, occupants, or tenants of real property.

100.    In creating crisis circumstances, including those indicating the release of MMA and hazardous chemical vapors or their byproducts into the surrounding environment near properties where Plaintiff and the Class owned, occupied, or resided in, Defendants created a condition that is an obstruction to the free use of the properties, so as to interfere with the comfortable enjoyment of the properties.

101.    The Crisis interfered with the use and enjoyment of the properties by Plaintiff and the Class.

102.    Plaintiff and the Class did not consent to Defendants' conduct.

103.    The seriousness of the harm outweighs the public benefit of Defendants' conduct.

104.    An ordinary person would be reasonably annoyed or disturbed by the Defendants' conduct.

105.    As a result of Defendants' conduct, Plaintiff and Class Members have suffered damages.

106.    Defendants acted with a conscious disregard of the rights of others and put their own financial interests ahead of the interests of Plaintiff and the Class, which constitutes malice.

107.    Defendants engaged in conduct that subjected Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights, which constitutes oppression.

108.    Thus, Defendants acted with oppression and/or malice and Plaintiff and the Class are therefore entitled to punitive damages in an amount according to proof at trial.

## COUNT IV – PUBLIC NUISANCE

### (On Behalf of Plaintiffs and the Class)

109.   Plaintiff restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraph of this Complaint as though fully set forth herein.

110.   Plaintiff brings this claim individually and on behalf of the proposed Class.

111.   At all relevant times, Defendants owned, operated, controlled, maintained, supervised, managed, or were otherwise responsible for the Facility, including the storage, handling, containment, maintenance, monitoring, and control of MMA and related hazardous chemicals and/or their byproducts.

112.   California Civil Code § 3479 defines a nuisance as "[a]nything which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." A public nuisance is one "which affects at the same time an entire community or neighborhood, or any considerable number of persons." Cal. Civ. Code § 3480.

113.   Defendants' acts and omissions, including the negligent storage, containment, maintenance, monitoring, supervision, and control of MMA, created dangerous conditions that substantially and unreasonably interfered with rights common to the general public, including public health, public safety, public peace, public comfort, public convenience, and the safe use of public and private property throughout the surrounding communities.

114.   The hazardous conditions created by Defendants resulted in widespread emergency response measures, including evacuation orders, shelter-in-place directives, road closures, emergency perimeters, hazardous materials response operations, public safety warnings, and substantial disruption to residential neighborhoods and surrounding communities in Garden Grove, Stanton, Cypress, Anaheim, Buena Park, Westminster, and nearby areas.

115.   Defendants' conduct created a substantial and continuing risk of fire, explosion, toxic vapor migration, environmental contamination, airborne chemical

23

exposure, and catastrophic harm affecting tens of thousands of residents, businesses, schools, roadways, public infrastructure, and properties located near the Facility.

116. The interference caused by Defendants was substantial, unreasonable, offensive, and harmful to the public, and would be highly offensive to an ordinary person.

117. Plaintiff and members of the proposed Class suffered injuries and damages different in kind from those suffered by the general public because Plaintiff and the Class members resided within or near the evacuation and impact zones, were forced to evacuate or shelter in place, suffered direct interference with the use and enjoyment of their homes and properties, incurred displacement-related expenses, and experienced heightened contamination concerns, fear, annoyance, inconvenience, and property-related damages.

118. California courts have long recognized that "[m]ere apprehension of injury from a dangerous condition may constitute a nuisance where it interferes with the comfortable enjoyment of property." *McIvor v. Mercer-Fraser Co.* (1946) 76 Cal.App.2d 247, 254. Here, the harm suffered by Plaintiff and the Class far exceeds mere apprehension. They were not simply worried about a hypothetical danger—they were physically removed from their homes pursuant to mandatory government evacuation orders, displaced for multiple days, and subjected to the ever-present threat of catastrophic explosion throughout the duration of the Crisis.

119. As a direct and proximate result of Defendants' conduct and the public nuisance created, Plaintiff and members of the proposed Class suffered damages, including, but not limited to, loss of use and enjoyment of property, evacuation-related damages, displacement costs, diminution in value, nuisance damages, emotional distress, annoyance, inconvenience, and other economic and non-economic harm.

120. Defendants acted with conscious disregard for the rights, safety, and well-being of Plaintiff, the Class, and the surrounding public, thereby entitling Plaintiff and the Class to punitive damages according to proof at trial.

## COUNT V – STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITY

### (On Behalf of Plaintiff and the Class)

121. Plaintiff restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

122. Plaintiff brings this claim individually and on behalf of the proposed Class.

123. Defendants' storage, handling, containment, maintenance, processing, monitoring, and control of large quantities of MMA and related hazardous industrial chemicals and byproducts constituted ultrahazardous or abnormally dangerous activities.

124. MMA is an inherently volatile, flammable, reactive, and toxic chemical substance that presents a substantial risk of catastrophic harm to persons, property, animals, and the environment when released, overheated, improperly contained, or otherwise uncontrolled. The dangers associated with MMA include fire, explosion, toxic vapor migration, airborne contamination, respiratory injury, chemical exposure, environmental contamination, and mass evacuation events affecting surrounding communities.

125. The risks associated with the storage and management of MMA are extraordinary and extend far beyond those ordinarily associated with routine industrial operations. Because MMA vapors readily aerosolize, migrate through the air, and accumulate in populated and low-lying areas, any loss of containment creates a substantial and foreseeable danger to neighboring residences, occupants, businesses, schools, and the public at large. Moreover, MMA's highly flammable and reactive nature creates a continuing risk of catastrophic ignition, combustion, explosion, and uncontrolled toxic release capable of causing widespread property damage, physical injury, contamination, displacement, and environmental harm.

126. The ultra-hazardous nature of Defendants' activities is further demonstrated by the fact that the risks posed by large-scale MMA storage and handling cannot be entirely eliminated through the exercise of reasonable care. Even where precautions are undertaken, the storage of substantial quantities of volatile industrial chemicals in close proximity to

25

residential communities necessarily creates a high degree of risk of serious harm in the event of equipment failure, overheating, containment failure, human error, chemical instability, mechanical malfunction, fire, or other operational failure. The magnitude of potential harm associated with MMA release, including toxic airborne plume migration, mandatory evacuations, exposure to hazardous vapors, and the threat of catastrophic explosion, renders such activities abnormally dangerous as a matter of law.

127.   Under the Restatement (Second) of Torts §§ 519–520, which California courts have adopted, an activity is deemed abnormally dangerous where the risk of harm is high, the potential severity of that harm is great, and the activity is not one of common usage in the location where it is conducted. Defendants' storage of thousands of gallons of a highly volatile, exothermically reactive chemical in the immediate vicinity of densely populated residential neighborhoods plainly satisfies each of these elements.

128.   At all relevant times, Defendants engaged in, authorized, controlled, supervised, and benefited from such ultra-hazardous activities at the Facility. Defendants knew or should have known that the storage and handling of MMA in substantial quantities created a foreseeable and unreasonable risk of catastrophic harm to nearby residents and properties, particularly given the Facility's proximity to densely populated residential communities.

129.   As a direct and proximate result of Defendants' ultrahazardous activities, Defendants created crisis circumstances, including those indicating the release of MMA and hazardous chemical vapors and their byproducts into the surrounding environment, resulting in emergency conditions such as evacuation orders, shelter-in-place directives, widespread fear of toxic exposure, interference with the use and enjoyment of residential properties, contamination concerns, and other damages suffered by Plaintiff and members of the proposed Class.

130.   Because Defendants engaged in ultrahazardous and abnormally dangerous activities, Defendants are strictly liable for all injuries, damages, losses, interference with

26

property rights, evacuation-related harm, nuisance conditions, contamination-related damages, diminution in value, emotional distress, and other injuries proximately resulting from the MMA release and related hazardous conditions, regardless of the degree of care exercised by Defendants.

## COUNT VI – TRESPASS TO CHATTELS/CONVERSION

### (On Behalf of Plaintiff and the Class)

131. Plaintiff restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

132. Plaintiff brings this claim individually and on behalf of the proposed Class.

133. At all times relevant to this Complaint, Plaintiff and the Class had and continue to have actual and constructive possession, and the immediate right to possession, of personal property.

134. Defendants' improper storage of MMA, as described herein, near Plaintiff's and the Class' personal property has caused an intrusion upon, changes to, damage to, and destruction or the perception of such alterations of Plaintiff's and the Class' property interest therein, and has deprived Plaintiff and the Class of the possession, control, and use of their property interests.

135. Such dominion and control by Defendants has and continues to wrongfully interfere with Plaintiff's and the Class' right of ownership of the personal property so as to constitute conversion of Plaintiff's and the Class' property interest in their personal property.

136. As a direct and proximate result of Defendants' exercise of dominion and control over Plaintiff's and the Class' personal property, Plaintiff and the Class have suffered all of the injuries and damages described herein. Defendants are liable for all such damage and punitive damages as set forth herein.

137. The aforementioned acts of the Defendants were willful, wanton, malicious, and oppressive, and taken with intent to interfere with or in reckless disregard to Plaintiff's and the Class' property rights, and justify an award of exemplary and punitive damages.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter a judgment in Plaintiff's favor and against all Defendants, as follows:

a. Certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff as Class Representative and his/her attorneys as Class Counsel;

b. Awarding Plaintiff and the Class actual damages, including compensatory and consequential damages, in an amount to be determined at trial;

c. Awarding remediation damages;

d. Awarding loss of use damages;

e. Awarding diminution in value damages;

f. Awarding evacuation and displacement damages;

g. Awarding nuisance damages;

h. Awarding punitive and exemplary damages in an amount to be determined just and reasonable;

i. Awarding Plaintiff and the Class pre-judgment and post-judgment interest on all amounts awarded;

j. Awarding Plaintiff and the Class such costs and disbursements as are incurred in prosecuting this action, including reasonable attorneys' fees, as allowable by law;

k. Granting injunctive and declaratory relief, as allowed by law; and

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

l.   Granting Plaintiff and the Class such other and further relief as this Court may deem just and proper.

Dated: May 27, 2026

Respectfully Submitted,

*/s/ Mazin A. Sbaiti*

Mazin A. Sbaiti, Esq. (SBN 275089)
**SBAITI & COMPANY PLLC**
Dallas Arts Tower
3102 Maple Avenue, Suite 400
Dallas, TX 75201
Email: mas@sbaitilaw.com
Tel: 214-214-3400

Christopher L. Ayers, Esq.
(*pro hac vice* forthcoming)
**SBAITI & COMPANY NJ LLC**
100 Mulberry St.
3 Gateway Center, Suite 1102
Newark, NJ 07102
Email: chris.ayers@sbaitilaw.com
Tel: 973-954-2000

*Attorneys for Plaintiff and Proposed Class*

29

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL